IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRUCE MCCREE,

    Plaintiff,

      v.

CIVIL ACTION FILE
NO. 1:06-CV-1279-TWT

TOM POCOCK,

    Defendant.

## ORDER

This is a civil rights action.  It is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 43] and the Defendant's Cross-motion for Summary Judgment [Doc. 45].  For the reasons set forth below, the Plaintiff's motion is DENIED and the Defendant's motion is DENIED.

## I. BACKGROUND

The Plaintiff, Bruce McCree, is a federal inmate housed at the Atlanta City Detention Center ("ACDC").  He is a Muslim.  The Defendant Thomas Pocock was Chief of Corrections for the City of Atlanta until his retirement on November 6, 2006.  ACDC is a six-story detention center in downtown Atlanta, Georgia that houses approximately 1,300 federal, state and city inmates on a given day.  These inmates are housed in twenty-two separate living units contained on the top four floors of this

facility.  Each floor has four distinct housing units commonly referred to as "pods." ACDC is a "direct supervision facility" that provides for the majority of an inmate's needs within his housing unit and thus requires him to engage in little or no movement between units.

The Plaintiff requested that ACDC permit him to transfer between pods on Fridays in order to participate in a Muslim religious exercise called Jumu'ah.[1] According to Imam Taalib-Din Sabir, Jumu'ah is a weekly Muslim congregational prayer performed on Fridays at 12:30 p.m. during daylight savings time and 1:30 p.m. during standard time.  (Sabir Decl., ¶ 13.)  Sabir and another qualified Muslim leader, Mr. Raoof, visit ACDC on Fridays to perform Jumu'ah.  Muslim religious doctrine prevents them from performing more than two Jumu'ah services on a given Friday. (Id., ¶ 14.) ACDC houses Muslim inmates in more than four housing units and does not allow them to transfer to other pods for this weekly prayer.  Therefore, the Plaintiff is prevented from meeting with one of these two Muslim leaders if they do not choose to visit his pod for one of their two Jumu'ah services.

On May 5, 2006, the Plaintiff filed this action against Defendant Pocock in his official capacity.  The Plaintiff claims that his rights under the Religious Land Use and

---

[1]The Defendant does not dispute that the Plaintiff's religious beliefs are sincerely held.

Institutionalized Persons Act of 2000 ("RLUIPA") had been violated.  Specifically, he seeks an injunction and declaratory relief requesting that the Defendant allow him "the opportunity to participate in Jumu'ah Prayer with other Muslim inmates and an Imam or other properly qualified Muslim each Friday."  (Compl., ¶ 1.)  Both parties now move for summary judgment on this claim.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

The Plaintiff claims that the Defendant's failure to permit him access to an Imam on Fridays constitutes a violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq*. RLUIPA, which the Supreme Court recently examined and found to be constitutional, see Cutter v. Wilkinson, 544 U.S. 709 (2005), provides for broad protection against infringements on prisoners' rights of religious exercise.  See 42 U.S.C. § 2000cc-3(g).  Under its provisions, an inmate must first make a prima facie case, demonstrating that: (1) a prison official imposed a "substantial burden" on his religious exercise; and (2) this burden was either imposed in a program or activity receiving federal funding or that affects interstate commerce.[2]  Id. § 2000cc-1(a).  In determining whether a proffered activity constitutes a "religious exercise," the Act states that this definition "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  Id. § 2000cc-5(7)(A).

If a prima facie case is demonstrated, the burden then shifts to the government to show that this imposition was both (1) "in furtherance of a compelling governmental interest"; and (2) the least restrictive means of furthering that interest. Id. § 2000cc-1(a). RLUIPA thus mandates "a 'more searching standard' of review of

---

[2]This second requirement is not at issue here.  It is undisputed that ACDC receives federal funding for its housing of Federal inmates.  (Pocock Dep. at 30, 54-55.)

free exercise burdens than the standard used in parallel constitutional claims: strict

scrutiny instead of reasonableness." Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir.

2006).[3]  With this heightened standard in mind, the Court assesses whether RLUIPA

has been violated in the present instance.

    A. Substantial Burden

This Court must first determine whether the Plaintiff has made a prima facie

showing that the Defendant has substantially burdened his religious exercise by not

allowing him to gather with other Muslims and an Imam for Jumu'ah.  Two separate

issues require consideration: (1) is Jumu'ah prayer so important to the Muslim faith

that its denial constitutes a substantial burden on the Plaintiff's religious exercise; and

(2) what is required for a Muslim adherent to perform Jumu'ah?

In addressing first the issue of what constitutes a "substantial burden" on

religious exercise, the Court notes the parties' disagreement as to the appropriate

standard.  Each cites as relevant authority different statements in a recent Eleventh

Circuit decision on RLUIPA. In Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d

---

[3]Congress established this higher standard of review for RLUIPA, as well as its
predecessor, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb
*et seq.*, in response to a Supreme Court ruling that "laws of general applicability that
incidentally burden religious conduct" were not in violation of the First Amendment's
Free Exercise Clause.  Employment Div., Dept. of Human Resources of Oregon v.
Smith, 494 U.S. 872 (1990); accord Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir.
2006).

1214, 1227 (11th Cir. 2004), two synagogues challenged a town zoning scheme that

prohibited churches and synagogues from locating in certain districts.  The plaintiffs

claimed that this ordinance violated their rights of religious exercise under RLUIPA.

In assessing whether the town ordinance had imposed a substantial burden, the court

stated:

> We have held that an individual's exercise of religion is "substantially
> burdened" if a regulation completely prevents the individual from
> engaging in religiously mandated activity, or if the regulation requires
> participation in an activity prohibited by religion.

Id. at 1227 (citing Cheffer v. Reno, 55 F.3d 1517, 1522 (11th Cir. 1995) and Church

of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1550 (11th

Cir. 1993)).  The Eleventh Circuit did not, however, state that this standard applied to

all RLUIPA actions.  After discussing both its own precedent and a standard from the

Seventh Circuit, the court held:

> The combined import of these articulations leads us to the conclusion
> that a "substantial burden" must place more than an inconvenience on
> religious exercise; a 'substantial burden' is akin to significant pressure
> which directly coerces the religious adherent to conform his or her
> behavior accordingly. Thus, a substantial burden can result from pressure
> that tends to force adherents to forego religious precepts or from pressure
> that mandates religious conduct.

Id. at 1227 (emphasis added).  Several other courts have acknowledged this to be the

standard in this circuit.  See, e.g., Lovelace, 472 F.3d at 187; Lawson v. McDonough,

2006 WL 3844474, at *23 (N.D. Fla. Dec. 27, 2006); Earl v. Gould, 2006 WL

983887, at *1 (W.D. N.C. April 11, 2006); <u>Farrow v. Stanley</u>, 2005 WL 2671541, at *4 (D. N.H. Oct. 20, 2005).  Nevertheless, the Defendant claims that the "<u>Cheffer</u>" standard is more appropriate.  Specifically, ACDC asserts that because <u>Midrash</u> involved a land use provision, the court did not consider the prison context and the "urgency of discipline, order, safety, and security in penal institution." (Def.'s Mot. for Summ. J., at 11.)  ACDC thus contends that a regulation constitutes a substantial burden only where it "completely prevents" the inmate from engaging in his "religiously mandated activity." (<u>Id.</u>)

This Court finds the Defendant's analysis to be off the mark in several respects. First, the Eleventh Circuit decisions cited as authority by the Defendant did not deal with the prison context.  Indeed, <u>Cheffer</u> was an abortion-clinic case addressing a challenge under RFRA to the validity of the Freedom of Access to Clinic Entrances Act of 1994.  <u>Church of Scientology</u> involved a First and Fourteenth Amendment challenge to an ordinance regulating charitable solicitations.  Furthermore, the deference shown to the security concerns of prison officials is appropriately applied when assessing the Defendant's claim of a compelling government interest.  The prison context has nothing to do, however, with the plaintiff's demonstration of a substantial burden.  A burden on religious exercise is no less significant to the faith of its adherent merely because the violation occurs in a prison environment.  The

Court thus finds that the Eleventh Circuit's subsequent definition of "substantial burden" in <u>Midrash</u> is the appropriate and controlling authority.

Accordingly, the Plaintiff must show that he has been forced, or directly coerced, into abdicating one of the precepts of his faith.  A "precept" is defined in Black's Law Dictionary as a "standard or rule of conduct; a command or principle." BLACK'S LAW DICTIONARY, 1215 (8th ed. 2004).  Here, the Plaintiff must demonstrate that the Defendant's policy has caused him to forego engaging in Jumu'ah.  A thorough examination of the parties' briefs reveals that they do not dispute that Jumu'ah is a religious precept of the Muslim faith and that its denial would be a substantial burden on the Plaintiff's religious exercise.  Indeed, Imam Sabir has provided uncontroverted evidence that this prayer is important to the Muslim faith, as indicated by the Koran's dedication of an entire chapter to it.  (Sabir Decl., ¶ 18.) Moreover, both parties cite to a Muslim website, IslamOnline, which states that Jumu'ah is "obligatory." (Def.'s Mot. for Summ. J., Ex. 8.)

Rather, the dispute hinges on the Court's second inquiry–the determination of what is required to perform Jumu'ah.  The Plaintiff's contention appears to be that Jumu'ah requires that every Muslim in ACDC congregate on Fridays for a prayer service led by an Imam.  (Pl.'s Mot. for Summ. J., at 4-5.)  The Defendant challenges this assertion in two material respects.  First, the Defendant contends in its summary

judgment motion that the Plaintiff "has failed to produce any affirmative evidence to support his contention that Jumu'ah prayer must be conducted under the leadership of an Imam." (Def.'s Mot. for Summ. J., at 14.) ACDC's Chaplain, Barry Singer, testified that Sabir informed him that although Muslims often do not feel comfortable conducting a Jumu'ah service without an Imam, the Imam's presence was not required. (Singer Dep. at 105.) IslamOnline further provides that "[i]f someone is unable to attend the Jumu'ah prayer, he or she should pray four rak'ahs of Zhuhr." (Def.'s Mot. for Summ. J., Ex. 8.) In response to the Defendant's motion, however, the Plaintiff provided Imam Sabir's declaration stating that Jumu'ah must be led by an Imam. (Sabir Decl., ¶ 15.) He also stated that the prayer of four rak'ahs was "not preferred to replace assembling to worship for Jumah prayer." (Id., ¶ 20.) What is left unresolved by this record is whether the prayer of four rak'ahs is actually an adequate substitute for Jumu'ah Prayer. Imam Sabir allegedly told Chaplain Singer that an Imam was not required for Jumu'ah, but now asserts in his recently-filed declaration that an Imam's presence is mandatory. The Court thus concludes that a genuine issue of fact exists for trial.

To the extent that the Plaintiff is arguing that a prayer of four rak'ahs on Fridays without an Imam is a Jumu'ah Prayer, but the "not preferred" version of it, the Court finds he has failed to demonstrate a substantial burden. In assessing what

practices constitute rules of conduct for a particular religion, this Court is mindful of the Eleventh Circuit's instruction that courts should not arbitrate inter-faith disputes concerning religious doctrine.  See Martinelli v. Dugger, 817 F.2d 1499, 1503-04 (11th Cir. 1987) ("Although it is true that in order to have the protection of the free exercise clause a plaintiff's claims must be rooted in religious beliefs . . . , the Supreme Court has admonished federal courts not to sit as arbiters of religious orthodoxy.") (citing Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 713 (1981), and Fowler v. Rhode Island, 345 U.S. 67, 69 (1953)); accord Daker v. Wetherington, Civil Action # 1:01-CV-3257-RWS (Order of August 1, 2005, at 43.).  If substantial means anything, however, it requires the Plaintiff to show that his religious exercise has been significantly hampered by the government's refusal to permit him to perform a particular practice.  Cf. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196 (2002) (stating that "'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree'") (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976)); see also Ford v. McGinnis, 352 F.3d 582, 593 (2d Cir. 2003) (stating that although courts are ill-suited to distinguish important from unimportant religious beliefs, the substantial burden test "presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly

characterized as constitutionally de minimis"). A demonstration that the Plaintiff has been forced to perform a version of his religious precept that is "not preferred" is insufficient under the Eleventh Circuit's standard to establish a prima facie violation of RLUIPA. It is clear from the court's explicit language in <u>Midrash</u> that a substantial burden is established only where an adherent must "forego" some religious rule of conduct. Jumu'ah is the religious precept at issue, and if no Imam is required, then no substantial burden has been imposed by the Imam's absence.

The presence of an Imam is not the only factual dispute in regards to Jumu'ah. The record also demonstrates conflicting accounts as to how many Muslims are required to perform the prayer of four rak'ahs in the absence of an Imam. To assess the validity of the Plaintiff's claim that it was "essential" that all Muslim inmates be relocated to perform Jumu'ah prayer "in mass," Pocock testified that he instructed his staff to consult with Imam Sabir. (Pocock Dep. at 20.) According to Pocock, Sabir confirmed that the Plaintiff's request "wasn't necessary" and "wasn't an essential requirement of that prayer." (<u>Id.</u> at 21.) Pocock allegedly learned from Sabir that "as long as there were two people of the Muslim faith in attendance, one could do what [Imam Sabir] referred to as 'the call,' and the other Muslim inmate could receive the call. And that's all that was required for that practice." (<u>Id.</u>) Singer states, however, that he was told by Sabir that "three or more" Muslim men, rather than just two, must

come together in order to perform Jumu'ah.  (Singer Dep. at 105.)  This difference also requires resolution by the factfinder.

B. Defendant's Compelling Government Interest

If the Plaintiff is able to demonstrate a substantial burden on his religious exercise, the Defendant must show that its refusal to permit the Plaintiff to congregate with other Muslims in other housing units for Jumu'ah constituted the least restrictive means of furthering a compelling state interest.  The Court notes, initially, that in applying this strict scrutiny review, the Supreme Court has emphasized that "context matters," and "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions."  Cutter, 544 U.S. at 723. Accordingly, the scrutiny is applied with "due deference to the experience and expertise of prison and jail administrators."  Id.

Here, the Defendant argues that it has a significant security and safety interest in refusing to accommodate the Plaintiff's request.  To demonstrate its security interest, the Defendant provides evidence that ACDC maintains a stringent classification system for assigning inmates to a housing unit when they are first admitted to the jail.  This process assesses security-related factors such as propensity for violence, escape risks, and mental health.  (Pocock Dep. at 25.)  Assignment of housing units varies depending on these factors.  For example, minimum and medium

security units might allow inmates "to congregate in day room areas for a certain number of hours each day based on their respective classifications," whereas maximum security units would contain only single cells and permit inmates to leave them for only one hour each day.  (Id.)

This classification system also serves ACDC's stated need to separate inmates that have been involved in some sort of gang activity.  Pocock explained that a number of the inmates are informants and parties to crimes for which companion inmates are also housed in ACDC, and it is a common practice to separate these prisoners from each other.  (Id. at 26.)  In fact, the United States Marshal, the United States Attorney's Office, and Immigration and Customs Enforcement Officers have on occasion alerted ACDC that certain inmates are going to "roll-over" on "their partners-in-crime."  (Id.)  ACDC's layout facilitates this need for separation because it operates as a "direct-supervision facility" where an inmate will have little or no movement within the facility once he has been placed.  As explained by Lieutenant Kailei Hinton, ACDC can cater to the majority of an inmate's needs strictly within his housing unit, including commissary, records, and visitation.  (Hinton Dep. at 24.)  Religious services are also provided within the housing unit.  Each unit, with the exception of the Medical Unit, contains a program room where inmates can gather for worship.  (Id.)

The Defendant also provides several safety concerns that allegedly prevent it from meeting the Plaintiff's suggested accommodation.   Pocock contends that allowing inter-housing unit transfers each Friday "could result in a serious injury, an assault, or worse."  (Pocock Dep. at 26.)  According to the Defendant, such transfers also require that prisoners be shackled and are staff intensive and fraught with uncertainty.  (Def.'s Mot. for Summ. J., at 17.)[4]

Despite these alleged concerns and the due deference provided them, the Court still finds that a genuine issue of fact exists here.  The Court accepts that ACDC has a compelling security interest in classifying inmates upon entrance into the facility and segregating them into housing pods based on the above-listed considerations.  What it must also show, however, is that preventing the Plaintiff's transfer for Jumu'ah is the least restrictive means of ensuring that this classification system is preserved.  In order to meet its burden, a prison generally must demonstrate "that it has actually considered and rejected the efficacy of less restrictive measures before adopting the

---

[4]The Defendant also claims that it has no way of knowing ahead of time whether the Imam is coming, which housing unit he would visit, or how many Muslims wished to participate.  (Def.'s Mot. for Summ. J., at 17.)  The Plaintiff correctly points out, however, that it would take little effort for each pod officer to ask the Muslims in his pod whether they wanted to attend weekly Jumu'ah, and then accordingly hold the prayer in the pod where the most Muslim inmates are housed and send the Imam to that housing unit.  The Defendant's contention is thus of little persuasive value and certainly does not demonstrate a compelling government interest.

challenged practice." <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 999 (9th Cir. 2005); <u>see also</u> <u>Turner v. Safley</u>, 482 U.S. 78, 90-91 (1987) ("This is not a least restrictive alternative test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.").  Here, to the contrary, Pocock testified that if he had been informed that this Jumu'ah prayer was essential, "it's something we would have discussed with the City fathers in terms of overtime or additional staffing."  (Pocock Dep. at 52.)

Furthermore, prison officials such as Pocock cannot simply "brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." <u>Marria v. Broaddus</u>, 2003 WL 21782633, at *14 (S.D.N.Y. July 31, 2003) (citation omitted).  The Defendant has cited no incidents of prison violence at ACDC arising out of religious exercise. (Pocock Dep. at 14; Hinton Dep. at 29; Singer Dep. at 22-23, 32.) Moreover, ACDC allows the majority of Muslim inmates to congregate in one housing unit during the last night of Ramadan, the "Night of Power." (Pocock Dep. at 22.)  The Defendant argues that Ramadan is distinct, however, in that it occurs only once a year, is scheduled well in advance, and requires the Department of Corrections to assign overtime to a number of its officers.  (Def.'s Mot. for Summ. J., at 18.)

Despite these alleged distinctions, Pocock's testimony also suggests that ACDC does not engage in an extensive screening process prior to this event and that the prison officials in charge looked only at the files for each attendant and "who is in maximum security and what for."  (Pocock Dep. at 27-28.)  No real explanation is provided as to why this same procedure could not be performed on a weekly basis. Indeed, there is record evidence that inmates are already reclassified each week based on potential changes in their behavior after court appearances.  Pocock testified that:

> Inmates go to court weekly.  New information is revealed in court that may impact your classification assignment for a particular inmate.  The inmate may now have been convicted, for example.  Last week he hasn't been.  Now he knows, under sentencing guidelines, that his worse case is 30 years in Federal prison.  That inmate has a different demeanor.

(Id. at 27.)  The Plaintiff thus contends that, because of this necessity for constant reclassification, no additional burden exists in requiring the Defendant to determine whether an inmate should be permitted to transfer each Friday for Jumu'ah.  Given this evidence, a reasonable factfinder could conclude that the Defendant's professed concerns are merely post hoc rationalizations for a policy that is not truly grounded in a compelling government interest.  See Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 989 (8th Cir. 2004) (holding that, to demonstrate a compelling interest,

prison officials "must do more than offer conclusory statements and post hoc rationalizations for their conduct") (citation omitted).[5]

_____

[5]Although not explicitly stated, ACDC's main concern in refusing to grant the Plaintiff's request appears to be lack of resources.  Indeed, Pocock stated that allowing an inmate to transfer pods during lunch on Friday:

> [W]ould triple the number [of staff] you would need at that time. Remember, at lunchtime, you're trying to feed 1,300 inmates in 22 living units, plus three or four operational areas.  You've got inmates in staging areas going to court, inmates at some step in the process returning from court.  You have to feed them.  You have to feed the inmates in the intake area.

(Pocock Dep. at 51-52.)   However, to the extent that ACDC is arguing that transferring inmates for weekly Jumu'ah prayer services is not feasible based on concerns of cost and staffing, such a rationale must be heavily scrutinized.

This Court's recent decision in Daker v. Wetherington, Civil Action # 1:01-CV-3257-RWS (Order of August 1, 2005), proves instructive on this point.  There, the plaintiff, an inmate and Muslim adherent, claimed _inter alia_ that his rights under RLUIPA had been violated because prison officials had denied him a weekly Islamic educational class, Ta'lim, in the absence of supervision by an Imam.  In response, one of the prison's proffered explanations for this denial was that "providing adequate supervision for such a gathering would overburden the staff and unduly tax prison resources."  (Id. at 44.)  The Court noted, however, that any argument by the prison that burdening religious exercise was necessary because of scarce resources must be viewed with skepticism.  Indeed, both Eleventh Circuit precedent and RLUIPA's legislative history indicate that a concern for lack of resources may not meet RLUIPA's strict scrutiny requirements.  See Benning v. Georgia, 391 F.3d 1299, 1312 (11th Cir. 2004) ("Georgia argues that RLUIPA will impose significant expenses on the DOC and prevent the DOC from providing other services, but if Georgia finds compliance with RLUIPA impractical, Georgia can refuse federal funds."); 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (Joint Statement of Senator Hatch and Senator Kennedy) ("It is well known that prisoners often file frivolous claims; it is less well known that prison officials sometimes impose frivolous or arbitrary rules.  Whether

The Plaintiff's other suggested alternative to ACDC's current policy would be for the prison permanently to house all Muslims in a few selected units in order to "permit sufficiently large groups of Muslim inmates to worship together." (Pl.'s Mot. for Summ. J., at 21.) What is unclear, however, is what constitutes a "sufficiently large" groups of Muslims. The Plaintiff has failed to define this term with any precision. The Defendant has provided evidence that only two or perhaps three Muslims are needed to congregate for Jumu'ah. (Pocock Dep. at 21; Singer Dep. at 105.) As discussed above, to the extent that the Plaintiff is arguing that a prayer group of two or three is not preferred to a congregation of the entire Muslim population in ACDC, the Court does not find such a restriction to be a substantial burden. It is undisputed that at least one other Muslim inmate is currently housed in the Plaintiff's pod, and the Plaintiff does not claim that he is restricted from praying with this individual. This suggested alternative would thus alleviate the current burden on his religious exercise only if he can show that three or more Muslims are required for Jumu'ah. The Defendant offers no evidence as to why it cannot place at least three

---

from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways.") (emphasis added); but see id. ("The committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.") (emphasis added).

Muslims in a given housing unit.  It makes only the conclusory statement that this suggestion:

> [S]ubordinates serious penological concerns and instead places greater emphasis on a prisoner's religious affiliations rather than on safety, security, and order.  Such a requirement is not only a radical departure, but it does not accord due deference to the importance of safety, security, order, and expertise of jail administrators.

(Def.'s Mot. for Summ. J., at 19.)  The Defendant cannot reasonably expect, however, that this Court will rule in its favor based solely on this call for due deference to its "penological concerns."  Although ACDC may have security concerns to consider in assigning housing units, it does not follow that placing the Plaintiff in a housing unit with two other Muslims automatically constitutes a radical departure from its normal procedures.  ACDC must provide evidence to support such a conclusion.  See Lovelace, 472 F.3d at 190 (concluding that a professed legitimate penological interest in restricting an inmate's access to a religious dietary program did not qualify as compelling because the prison failed to present any evidence "with respect to the policy's security or budget implications.").

If the Plaintiff demonstrates only that an Imam is required for Jumu'ah, however, the Court finds that his suggested alternative would fail to provide the relief he seeks–the opportunity to worship with an Imam each time an Imam comes to ACDC.  Even if every Muslim inmate was placed in a single housing unit, there is still

the possibility that no qualified prayer leader would visit the prison on a given Friday. The Plaintiff would thus be left to perform four rak'ahs with the other Muslims in his unit.  This leaves him no better off than he is now and does not ease the burden on his religious exercise.

After examining all the Defendant's evidence and giving all due deference to the expertise of ACDC officials, the Court concludes that a genuine issue of fact exists as to whether the Defendant has engaged in the least restrictive means of furthering its compelling government interest in the safety and security of its facility.  If the Plaintiff is able to demonstrate that Jumu'ah requires an Imam or at least two other Muslims, the Defendant must prove that its policy of prohibiting the transfer of Muslims on Fridays and refusing to place the Plaintiff in a housing unit with at least two other Muslims is the least restrictive means of furthering its compelling interest. Summary judgment for either party is thus unwarranted.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment [Doc. 43] is DENIED and the Defendant's Cross-motion for Summary Judgment [Doc. 45] is DENIED.

SO ORDERED, this 18 day of June, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge